HARRY L. PARKIN ET AL *v.* WALTER M. DAY ET AL

5-5477                                        463 S. W. 2d 656

Opinion delivered March 1, 1971

*Spitzberg, Mitchell & Hays* and *Smith, Williams, Friday & Bowen,* for appellant.

*Joe Purcell* and *Lyle Williams,* for appellees.

GEORGE ROSE SMITH, Justice. By Act 100 of 1967 the General Assembly authorized state agencies to purchase duplicating equipment, which is used for making multiple copies of documents, forms, and other papers. Ark. Stat. Ann. §§ 14-354 to -356 (Repl. 1968). Under the

authority of the act the appellees, who constitute the Legislative Joint Auditing Committee, decided to buy a Multilith Duplicator, made by the Addressograph Multigraph Corporation. The Auditor of State, relying upon opinions delivered by the Attorney General from time to time, refused to approve the purchase, on the ground that the machine would produce "printing," contracts for which must be let to the lowest responsible bidder under Article 19, § 15, of the Constitution of 1874.

The appellees then brought this suit for a declaratory judgment with respect to the validity of Act 100 insofar as it authorizes the purchase of a machine such as a Multilith Duplicator. Interventions were filed by the appellants, who are printers or representatives of the printing industry. After a trial at which many witnesses were heard, the chancellor concluded that Act 100 is valid and that the proposed purchase is not forbidden by the Constitution. The correctness of those conclusions is the issue on appeal.

A Multilith Duplicator appears, from the testimony and exhibits in the record, to be a machine about four feet long, two feet wide, and four feet high. The operator inserts the original paper that is to be duplicated. By a series of processes that are largely automatic in the sense that great skill on the part of the operator is not required, the machine turns out duplicates at speeds up to 250 copies a minute. The machine first makes a "master," which is a reverse-reading (mirror image) copy of the sheet to be duplicated. The "master" may be imprinted on paper if only a few copies are needed or on aluminum if a great many copies are required. The machine produces copies by the application of ink to the surface of the "master," which in turn is applied to blank pieces of paper in much the same way as a lithographic printing press produces printed matter. A more elaborate model of the Multilith Duplicator is capable of turning out copies that have written or printed matter on both sides of the paper.

The emergency clause of Act 100 contains a legislative finding that the use of modern duplicating equip-

ment will save thousands of dollars in state printing costs. There is testimony that the use of such equipment by the Revenue Department and by the Joint Auditing Committee may save as much as $20,000 a year. Although that testimony is not entirely undisputed, it is fair to say from the proof that the legislature was justified in finding that the use of modern equipment can effect a saving of tax dollars.

The constitutional provision in question was manifestly designed to save money by requiring that certain contracts be let by competitive bidding. The pertinent sentence in Article 19, § 15, reads as follows:

> All stationery, printing, paper, fuel, for the use of the General Assembly and other departments of government, shall be furnished and the printing, binding and distributing of the laws, journals, department reports and all other printing and binding, and the repairing and furnishing the halls and rooms used for the meetings of the General Assembly and its committees, shall be performed under contract to be given to the lowest responsible bidder, below such maximum price and under such regulations as shall be prescribed by law.

In Section 1 of Act 100 the General Assembly recognized the existence of a constitutional question, in this language:

> In the passage of this act, the General Assembly is cognizant of the requirements of Section 15 of Article 19 of the Constitution of the State of Arkansas that all printing required by the General Assembly and state agencies and departments shall be performed under contract to be given to the lowest responsible bidder, with such contract to be approved by the Governor, Auditor and Treasurer. The General Assembly is further aware of the fact that improved technology has made available various types of duplicating equipment and processes which were not in existence at the time of the

adoption of the Constitution, and which are not printing processes for which contracts were to be let pursuant to the provisions of Section 15 of Article 19 of the Constitution. It is, therefore, the purpose and intent of this act to define such duplicating equipment and processes to the extent that the same may be used by state agencies, yet preserving the requirements that all printing needs of state agencies let under contract shall be as provided in the Constitution. [Ark. Stat. Ann. § 14-354.]

In the second section of Act 100 the General Assembly set forth a comprehensive description of duplicating equipment that may be purchased and used by state agencies. Section 14-355.

At the trial the various parties to the case attempted to show by knowledgeable witnesses what is printing and what is not printing. The only conclusion to be drawn with confidence from the record is that it is impossible to arrive at a precise definition of printing. Among the factors stressed by one or another of the witnesses were: (a) Whether the particular process involves the production of an original or the mere duplicating of an existing original; (b) whether the work is done on the premises or outside in a commercial printing establishment; (c) the comparative size of the equipment being used; (d) the degree of skill needed to operate the equipment; (e) whether lithography is involved; (f) whether an offset process is involved; (g) whether photography is involved; (h) the distinction between the use of ink and the use of powder, as in xerography; (i) the number of copies being made; and (j) whether the particular process or machine has been generally accepted and used by the printing industry.

The proof clearly establishes what several of the witnesses stated in substance: Printing and the various modern methods of duplicating all have some characteristics in common and some points at which they tend to overlap one another. In between the two extremes represented by commercial printing on the one hand and the simpler forms of duplicating on the other, there is a

middle ground occupied by machines and processes that cannot be classified one way or the other with absolute assurance.

In this court, both in the briefs and in the oral arguments, the appellants have put their principal emphasis upon factor (j)—the usages within the printing trade itself—as the most reliable method of distinguishing printing from duplicating. By using that test the appellants profess to have no objection to the use by state agencies of the simpler methods of making copies, such as typewriting with carbon paper, stenciling, and mimeographing, or to the use of certain duplicating equipment identified by brand names, such as Ditto, Thermofax, Verifax, and Xerox.

The weight of the evidence does not support the appellants' contention that printing is properly defined as the product of the processes and machines that have been generally accepted and used by the printing industry. That definition appears to be merely a self-serving conclusion expressed by interested witnesses who are engaged in the printing business. To accept that point of view would mean in reality that the effect of the constitutional provision in question would be not so much to effect economies in state government as to establish a monopoly in the field of modern duplicating equipment, regardless of the comparative expense to the state.

Moreover, the evidence does not show that the Multilith Duplicator has been accepted and used exclusively or even predominantly by the printing industry. To the contrary, the record shows that 85% of all Multilith Duplicators have been purchased for in-office or on-premises use by private businesses or governmental agencies. Some of the remaining 15% of sales have been to printers, but the same thing could be said of typewriters, mimeographs, and other office machines that are useful in large business establishments.

We conclude from the preponderance of the testimony that modern on-premises duplicating equipment

comprises a separate category that came into existence after the adoption of the Constitution of 1874. Such machines have some aspects and characteristics in common with printing presses, but it does not follow that duplicating equipment produces "printing" as that term was understood in 1874 or as it is understood today. To the contrary, it is the essential and intended suitability of duplicating machines to in-office use that is their distinguishing quality. We are unwilling to say that the General Assembly exceeded its constitutional authority in permitting state agencies to use the same type of modern office machinery that is customarily used in business establishments throughout the country.

Affirmed.

FOGLEMAN, J., not participating.